**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CORNEILLE NANGAA YOBELUO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-02973 (RC) |
| | ) | |
| ANDREA M. GACKI, Director, | ) | |
| Office of Foreign Assets Control, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

I.      The International Emergency Economic Powers Act ........................................ 3

II.     DRC Economic Sanctions ................................................................................ 4

III.    Procedural History ............................................................................................ 6

        a.      OFAC's Designation of Nangaa ............................................................ 6

                i.      OFAC Found That CENI Delayed The DRC's Presidential
                        Election Multiple Times, And May Have Awarded The Presidency
                        To A Losing Candidate. ............................................................. 7

                ii.     OFAC Found That Nangaa Engaged In Corrupt Activity In His
                        Role As CENI President. ........................................................... 8

        b.      Nangaa's Petition For Reconsideration Of His Designation. ................. 9

        c.      OFAC's Denial of Nangaa's Petition For Reconsideration ................. 11

        d.      Procedural History .............................................................................. 13

LEGAL STANDARDS ................................................................................................ 14

ARGUMENT .............................................................................................................. 15

I.      OFAC's Denial of Nangaa's Petition For Reconsideration Accords With the Fifth
        Amendment. ...................................................................................................... 15

        a.      Nangaa Cannot Assert Constitutional Rights. ..................................... 15

        b.      Nangaa's Fifth Amendment Due Process Arguments Fail On The Merits. ........ 18

                i.      OFAC Afforded Nangaa Constitutionally Sufficient Process. ............... 19

                ii.     OFAC Appropriately Relied On Classified Information. ........................ 20

                iii.    Nangaa Was Not Entitled To Disclosure Of The State
                        Department's Foreign Policy Guidance Before OFAC Denied His
                        Petition. .................................................................................... 22

                iv.     Nangaa's Complaints About Specific Redactions Are Not Before
                        The Court, And Lack Merit In Any Event. ................................. 23

II.     OFAC Provided Nangaa With Sufficient Notice Under the APA. .................................... 24

III.    OFAC Did Not Violate The APA By Denying Nangaa's Petition For
        Reconsideration ............................................................................................................... 25

        a.      OFAC's Determination Is Entitled To Substantial Deference ............................ 25

        b.      OFAC's Reasoned Decision Satisfies This Deferential Standard. ...................... 27

                i.      OFAC Reasonably Concluded That The Original Basis For
                        Nangaa's Designation Still Applies. ........................................................ 27

                ii.     OFAC Reasonably Concluded That Nangaa Had Not
                        Demonstrated A Sufficient Change In Circumstances. ............................ 31

        CONCLUSION ................................................................................................................. 33

# TABLE OF AUTHORITIES

## CASES

*32 County Sovereignty Committee v. Department of State*,
   292 F.3d 797 (D.C. Cir. 2002) ............................................................................... 16

*Ajaka v. Gacki*,
   No. 1:19-CV-01542 (CJN), 2021 WL 3633609 (D.D.C. Aug. 17, 2021) ............................... 22

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
   686 F.3d 965 (9th Cir. 2012) ................................................................................ 20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................... 13, 16

*Bazzi v. Gacki*,
   468 F. Supp. 3d 70 (D.D.C. 2020) ........................................................................... 21

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................... 14

*Camp v. Pitts*,
   411 U.S. 138 (1973)......................................................................................... 23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)..................................................................................... 24, 25

*Conant v. Wells Fargo Bank, N.A.*,
   60 F. Supp. 3d 99 (D.D.C. 2014) ............................................................................ 14

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981).......................................................................................... 3

*Deripaska v. Yellen*,
   No. 21-5157, 2022 WL 986220 (D.C. Cir. Mar. 29, 2022) ..................................................... 21

*Dominguez v. UAL Corp.*,
   666 F.3d 1359 (D.C. Cir. 2012), *aff'd sub. nom.*, 852 F.3d 1114 (D.C. Cir. 2017)................. 13

*Fares v. Smith*,
   901 F.3d 315 (D.C. Cir. 2018) .............................................................................. 19

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015) .......................................................................... 20

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985)......................................................................................... 24

*Fulmen Co. v. OFAC,*
    547 F. Supp. 3d 13 (D.D.C. 2020) ................................................................ 17, 18

*Gilbert v. Homar,*
    520 U.S. 924 (1997) ............................................................................................. 18

*Hinton v. Corr. Corp. of Am.,*
    624 F. Supp. 2d 45 (D.D.C. 2009) ....................................................................... 14

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ................................................................................................. 25

*Holy Land Found. for Relief & Dev. v. Ashcroft,*
    219 F. Supp. 2d 57 (D.D.C. 2002) ....................................................................... 26

*Holy Land Found. for Relief and Dev. v. Ashcroft,*
    333 F.3d 156 (D.C. Cir. 2003) ............................................................ 18, 20, 26

*Islamic Am. Relief Agency v. Gonzales,*
    477 F.3d 728 (D.C. Cir. 2007) ..................................................................... 25, 32

*Jifry v. FAA,*
    370 F.3d 1174 (D.C. Cir. 2004) ...................................................... 15, 17, 20

*Johnson v. Eisentrager,*
    339 U.S. 763 (1950) ............................................................................................. 15

*Joumaa v. Mnuchin,*
    *("Joumaa II"),* 798 F. App'x 667 (D.C. Cir. 2020) ..................................... 17, 28

*Joumaa v. Mnuchin,*
    No. 17-2780 (TJK), 2019 WL 1559453 n.13 (D.D.C. Apr. 10, 2019) ................... 17

*Kadi v. Geithner,*
    42 F. Supp. 3d 1 (D.D.C. 2012) .................................................................... 15, 19

*Khadr v. United States,*
    529 F.3d 1112 (D.C. Cir. 2008) ........................................................................... 13

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ............................................................................................. 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................... 25

*National Council of Resistance of Iran v. Department of State,*
    251 F.3d 192 (D.C. Cir. 2001) ............................................................................. 15

*Olenga v. Gacki*,
   507 F. Supp. 3d 260 (D.D.C. 2020) ................................................................. *passim*

*Orvis v. Brownell*,
   345 U.S. 183 (1953) ...................................................................................... 3

*Pejcic v. Gacki*,
   Civil Action No. 19-2437 (APM), 2021 WL 1209299 (D.D.C. Mar. 30, 2021) ............... 26, 31

*People's Mojahedin Org. of Iran v. Dep't of State*,
   182 F.3d 17 (D.C. Cir. 1999) ........................................................................ 16

*Prisology v. Fed. Bureau of Prisons*,
   74 F. Supp. 3d 88 (D.D.C. 2014) ................................................................... 13

*Propper v. Clark*,
   337 U.S. 472 (1949) ...................................................................................... 3

*Rakhimov v. Gacki*,
   No. CV 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020) ............................... *passim*

*Regan v. Wald*,
   468 U.S. 222 (1984) ...................................................................................... 3

*Sulemane v. Mnuchin*,
   No. 16-1822 (TJK), 2019 WL 77428 (D.D.C. Jan. 2, 2019) .................................... 23

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ...................................................................................... 15

*Williams v. Lew*,
   819 F.3d 466 (D.C. Cir. 2016) ........................................................................ 16

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
   750 F. Supp. 2d 150 (D.D.C. 2010) ................................................................ 25, 31

*Zevallos v. Obama ("Zevallos I")*,
   10 F. Supp. 3d 111 (D.D.C. 2014) .............................................................. 14, 18, 25

*Zevallos v. Obama ("Zevallos II")*,
   793 F.3d 106 (D.C. Cir. 2015) ....................................................................... *passim*

**STATUTES**

5 U.S.C. § 555(e) .......................................................................................... 24

5 U.S.C. § 701 .............................................................................................. 2

5 U.S.C. § 706(2)(A) ...................................................................................... 24

50 U.S.C. § 1701 ................................................................................................. 1

50 U.S.C. § 1701(a) ............................................................................................ 3

50 U.S.C. § 1702(c) ............................................................................ 19, 21, 28

50 U.S.C. § 1702(a)(1)(B) ................................................................................ 16

50 U.S.C. § 4301 ................................................................................................ 3

50 U.S.C. § 4305(b)(1) ...................................................................................... 3

Trading With the Enemy Act ("TWEA"),
    40 Stat. 411 (1917) ........................................................................................ 3

## LEGISLATIVE MATERIALS

S. Rep. No. 95-466 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541 ..................... 3

## RULES

Fed. R. Civ. P. 12(d) ........................................................................................ 14

Fed. R. Civ. P. 56(a) ........................................................................................ 14

## REGULATIONS

31 C.F.R. pt. 547 ............................................................................................... 6

31 C.F.R. § 501.807 ...................................................................................... 6, 19

31 C.F.R. § 547.802 ........................................................................................... 6

Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to
    Commit, or Support Terrorism, Exec. Order No. 13,224,
    66 Fed. Reg. 49079 (Sept. 23, 2001) ............................................................ 4

Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters,
    Exec. Order No. 13,382, 70 Fed. Reg. 38567 (June 28, 2005) ........................... 4

Exec. Order No. 13,413, 71 Fed. Reg. 64105 (Oct. 27, 2006) ........................... 4

Exec. Order No. 13,671, 79 Fed. Reg. 39949 (July 8, 2014) ............................... *passim*

## INTRODUCTION

For more than a decade, the Executive Branch has viewed the widespread violence and atrocities committed in the Democratic Republic of the Congo ("DRC") as a threat not only to regional stability but also to the United States' foreign policy.  In accordance with its constitutional and statutory authority, the Executive Branch has addressed that foreign policy threat in part by imposing economic sanctions on persons who have contributed to the conflict in the DRC.  Such persons include those who recruit and use child soldiers, impede disarmament, and undermine the DRC's democratic processes or institutions.

In 2015, Plaintiff Cornielle Nangaa Yobeluo ("Nangaa") became President of the DRC's Independent National Election Commission ("CENI"), the body responsible for orchestrating the 2016 elections in the DRC.  Those elections were delayed multiple times, and did not take place until December 2018.  Following an investigation that included review of open source and classified reporting, the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") determined that Nangaa was responsible for or complicit in, or had engaged in, directly or indirectly, actions or policies that undermine democratic processes or institutions in the DRC. Specifically, evidence provided OFAC with reason to believe that Nangaa, personally and through officials under his direction, had embezzled and misappropriated state assets meant for election administration, had undertaken activities that impeded voter registration, and had bribed justices on the DRC's Constitutional Court to uphold CENI's decision to delay the 2016 elections.

Accordingly, on March 21, 2019, OFAC designated Nangaa as a Specially Designated National and Blocked Person ("SDN") pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701–1708 ("IEEPA"), and Executive Order 13,413, 71 Fed. Reg. 64105 (Oct. 27, 2006) ("E.O. 13,413"), as amended by Executive Order No. No. 13,671, 79 Fed. Reg. 39949

(July 8, 2014) ("E.O. 13,671"), thereby blocking all of Nangaa's property and interests in property in the United States or in the possession or control of a U.S. person.  Nangaa subsequently petitioned OFAC to reconsider his designation and remove him from the Specially Designated Nationals and Blocked Persons List ("SDN List").  After conducting a thorough review of its own evidence as well as evidence submitted by Nangaa, OFAC denied his petition.

In this lawsuit, Nangaa challenges that denial, asserting causes of action under the Fifth Amendment to the U.S. Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  The theories he advances, however, are all without merit.  First, according to Nangaa, OFAC failed to provide him adequate notice of the basis for its denial of his petition for reconsideration.  But as a foreign national without substantial contacts with the United States, Nangaa cannot assert claims based on constitutional rights.  Moreover, whether viewed through the lens of the Fifth Amendment or the APA, the information disclosed by OFAC—including the unclassified administrative record, a press release summarizing specific allegations of corruption, and a decision letter rejecting Nangaa's arguments—more than adequately apprised Nangaa of the reasons for OFAC's decision.  Nangaa further asserts that OFAC's denial of his petition was arbitrary and capricious.  However, the record before OFAC confirmed that Nangaa is responsible for or complicit in, or has engaged in, directly or indirectly, actions or policies that undermine democratic processes or institutions in the DRC; namely, that Nangaa embezzled monies, diverted funds, and delivered bribes, resulting in the delay of the DRC's 2016 elections.  Particularly given the deference afforded to the Executive Branch under the APA and in the realm of national security and foreign policy, OFAC had a reasonable basis to deny Nangaa's petition.

Accordingly, the Court should dismiss Nangaa's claims or, in the alternative, grant summary judgment in favor of Defendants.

2

## BACKGROUND

### I.     The International Emergency Economic Powers Act

For nearly its entire history, the United States has used economic sanctions as a critical means to protect national security and achieve foreign policy goals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917.  *See* Trading with the Enemy Act, Ch. 106, 40 Stat. 411, 411–16 (1917) (codified as amended at 50 U.S.C. §§ 4301–4341).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981); 50 U.S.C. § 4305(b)(1).  Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze an entity's property.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).  In 1977, Congress amended TWEA and enacted IEEPA.  *See* S. Rep. No. 95-466, at 1-2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declare national emergencies.  *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  While the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a).  Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or

> transactions involving, any property in which any foreign country or a national
> thereof has any interest . . . with respect to any property, subject to the jurisdiction
> of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, presidents have imposed sanctions with respect to many countries, including Russia, Iran, and North Korea, as well as on individuals, such as narcotics traffickers, proliferators of weapons of mass destruction, and terrorists and their supporters.  *See, e.g.*, Blocking Property With Respect To Specified Harmful Foreign Activities of the Government of the Russian Federation, Exec. Order No. 14,024 86 Fed. Reg. 20249 (April 19, 2021) (blocking assets of persons who have engaged in certain harmful activities on behalf of the Russian government); Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, Exec. Order No. 13,382, 70 Fed. Reg. 38567 (June 28, 2005) (blocking assets of persons who have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction and their supporters); Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (blocking assets of persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten" U.S. national security).

## II.    DRC Economic Sanctions

In October 2006, pursuant to IEEPA, the President issued Executive Order No. 13,413, "Blocking Property of Certain Persons Contributing to the Conflict in the Democratic Republic of the Congo."  Exec. Order No. 13,413, 71 Fed. Reg. 64105 (Oct. 27, 2006).  In E.O. 13,413, the President determined that "the situation in or in relation to the Democratic Republic of the Congo, which has been marked by widespread violence and atrocities that continue to threaten regional

4

stability . . . constitutes an unusual and extraordinary threat to the foreign policy of the United States," and "declare[d] a national emergency to deal with that threat." *Id.*  In July 2014, also pursuant to IEEPA, the President took additional steps with respect to this national emergency with the issuance of Executive Order No. 13,671, "Taking Additional Steps to Address the National Emergency [w]ith Respect to the Conflict in the Democratic Republic of the Congo," which amended E.O. 13,413.  The President explained that additional steps were warranted "in light of the continuation of activities that threaten the peace, security, or stability of the Democratic Republic of the Congo and the surrounding region." *Id.*  In particular, E.O. 13413, as amended, authorized the blocking of all property and interests in property of, *inter alia*:

> (ii)  any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:
> . . .
>
>> (C) to be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following in or in relation to the Democratic Republic of the Congo:
>> . . .
>>
>>> (2) actions or policies that undermine democratic processes or institutions in the Democratic Republic of the Congo.

*Id.* § 1(a)(ii)(C)(2).

The Executive Order further authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to "take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and the [United Nations Participation Act], as may be necessary to carry out the purposes of this order," and to re-delegate such functions as needed.  E.O. 13,413, as amended, § 4.  Subsequently, the Secretary of the Treasury delegated

to the Director of OFAC the authority to block persons under the Executive Order.[1]  *See* 31 C.F.R. § 547.802.

An individual or entity designated by OFAC pursuant to E.O. 13,413, as amended (as well as other authorities), is referred to as an SDN, and OFAC maintains a list of such individuals or entities whose assets are blocked.  Once designated, an SDN may "seek administrative reconsideration" of the designation, or may "assert that the circumstances resulting in the designation no longer apply."  31 C.F.R. § 501.807.  In doing so, the SDN "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation," and may "propose remedial steps on the person's part . . . which the person believes would negate the basis for designation."  *Id.* § 501.807(a).  Additionally, the SDN may request a meeting with OFAC, but OFAC may, in its discretion, decline such meetings.  *Id.* § 501.807(c).  After conducting a review, OFAC will "provide a written decision" to the SDN.  *Id.* § 501.807(d).  OFAC's regulations do not limit the number of times a SDN may seek to challenge the designation administratively.  *See Rakhimov v. Gacki*, No. CV 19-2554 (JEB), 2020 WL 1911561, at *2 (D.D.C. Apr. 20, 2020) ("A designated person can request delisting as many times as he likes.") (citation omitted).

### III.   Procedural History

#### a.  OFAC's Designation of Nangaa

On March 21, 2019, OFAC blocked Nangaa's property and interests in property pursuant to E.O. 13413, as amended, § 1(a)(ii)(C)(2), for being responsible for or complicit in, or for having engaged in, directly or indirectly, actions or policies that undermine democratic processes or

---

[1]  Also pursuant to the delegation of authority, OFAC promulgated regulations to implement E.O. 13,413 and E.O. 13,671.  *See generally* 31 C.F.R. pt. 547.

institutions in the DRC.  *See* Certified Administrative Record ("A.R.") 21–22 (OFAC Designation and Blocking Memorandum), 23–24 (Federal Register Notice), 25–28 (Press Release), 32–45 (Unclassified OFAC Designation Evidentiary Memorandum).

> **i. OFAC Found That CENI Delayed The DRC's Presidential Election Multiple Times, And May Have Awarded The Presidency To A Losing Candidate.**

The record before OFAC established that then-DRC President Josef Kabila had been in power since the assassination of his father in 2001.  A.R. 34, 66.  Kabila's term of office was set to expire at the end of 2016, and presidential elections were scheduled to be held on November 27, 2016.  A.R. 34–35, 66–68.  In August of that year, CENI disclosed that the elections would be delayed for at least a year, citing funding shortages and delays registering voters across the DRC. A.R. 35, 71–73, 95–97.  In September of 2016, CENI announced that the elections would be further delayed until December 2018.  A.R. 35, 80–83, 98–99.

The elections were finally scheduled for December 23, 2018.  A.R. 36.  Several days before the elections, a fire destroyed voting materials in the DRC's capital, Kinshasa.  A.R. 36, 157–61. Nangaa announced that due to the lack of materials, the elections would be delayed for another week.  *Id*. The elections ultimately took place on December 30, 2018, more than two full years after the date for which they were originally scheduled.  A.R. 36.  The newly elected president, Felix Tshisekedi, faced suspicion that he made a backroom agreement with Kabila in order to win the presidency, and that Kabila would continue to exercise influence "behind the scenes" through Tshisekedi.  A.R. 36, 188.  Reporting indicated that Congolese sources had been informed by senior Congolese officials that another candidate, Martin Fayulu, had won the election decisively, but that top officials ordered CENI to award the presidency to Tshisekedi, after he struck a deal with Kabila.  A.R. 36, 191.

### ii.  OFAC Found That Nangaa Engaged In Corrupt Activity In His Role As CENI President.

The record further established that, during his tenure as CENI President, Nangaa, along with other CENI officials under his direction, "embezzled and misappropriated CENI operational funds and undertook actions that slowed voter registration, facilitating election delays."  A.R. 26 (OFAC Press Release).  Specifically:

- Nangaa "oversaw CENI officials using several shell companies to embezzle CENI operational funds for their own personal and political gain;"

- Nangaa and other CENI officials "enriched themselves through the purchase and sale of gasoline for profit at the expense of CENI," which delayed registration in the Province of Kasai, "an opposition stronghold," and "meant that many voters were unable to register;"

- "In acquiring fuel to power generators for CENI offices, Nangaa negotiated a discounted rate and retained the difference from the budgeted amount to divide among senior CENI employees," and "subsequently instructed CENI officials to fabricate receipts to account for the spending gap;"

- "Under Nangaa's leadership, CENI officials inflated by as much as $100 million the costs for the electronic voting machine contract with the intent to use surplus funds for personal enrichment, bribes, and campaign costs to fund the election campaign of Kabila's candidate;"

- Nangaa and other CENI officials "awarded an election-related contract and doubled the award amount on the understanding that the winning company would award the extra funds to a DRC company controlled by CENI leadership;"

- Nangaa "approved the withdrawal of CENI operation funds for non-authorized budget items for personal use by DRC government employees," and "ordered CENI employees

to fabricate expense receipts to cover spending gaps resulting from CENI funds being used for personal gain."

- Lastly, Nangaa "delivered bribes to Constitutional Court justices to uphold a decision by the CENI to delay DRC's 2016 elections."

*Id.*

Based on both the open-source and classified or otherwise protected evidence available to it, OFAC concluded that Nangaa met the elements for designation under E.O. 13413, as amended. *See* A.R. 21–24.  OFAC thus designated Nangaa as an SDN and added him to the SDN List.  *Id.*

At Nangaa's request, OFAC produced to Nangaa a redacted, unclassified version of the administrative record supporting his designation.  A.R. 971.

### b.  Nangaa's Petition For Reconsideration Of His Designation

On February 10, 2021, Nangaa submitted a petition for reconsideration of his designation.[2] A.R. 210-239.  His petition advanced two primary arguments: First, that an insufficient basis existed for his designation, and second, that there had been a change in circumstances negating the basis for the designation.  A.R. 229.

With respect to the first argument, Nangaa denied that he misappropriated CENI funds.  *Id.* He asserted that multiple parties in the DRC government had oversight over CENI's finances, and that none of those parties had raised concerns regarding embezzlement.  A.R. 232, 235.  He denied engaging in embezzlement through the purchase and sale of gasoline, arguing that gasoline prices

---

[2] Nangaa filed an initial lawsuit challenging his designation, *see Nangaa v. Gacki, et al.*, No. 19-3415-DLF (D.D.C.), but the parties reached a settlement in which Nangaa agreed to file a stipulation of dismissal in return for Defendants' observance of specific timelines with regard to the administrative reconsideration process.  *See* A.R. 1473–79.

were set by the DRC's Economic Minister.   A.R. 232.  And he argued that delays in registration in the Kasai province resulted from a local insurrection, not embezzlement.  A.R. 233.

Nangaa additionally denied doubling the value of an election-related contract on the understanding that the winning company would provide the extra award to a DRC company controlled by CENI leadership.  A.R. 234.  Nangaa conceded that he previously maintained an interest in a DRC company, but argued it had no relationship with CENI or CENI officials other than himself.  *Id.*  He further denied authorizing CENI employees to make personal use of CENI operational funds and to fabricate expense reports.  A.R. 235.  And he denied overseeing the inflation of costs for electronic voting machines, asserting that their purchase followed public procurement requirements under DRC law.  A.R. 233–34.

Nangaa also asserted that even if he had misappropriated CENI assets, doing so did not cause the election delays, and thus did not undermine the DRC's democratic processes or institutions.  A.R. 230.  And he denied bribing Constitutional Court Justices, arguing that there would have been no need to do so, given that the court's decision upholding a postponement of the election was, in his view, consistent with DRC law.  A.R. 235–36.

Finally, Nangaa asserted a change in circumstance based on factors including his intent to leave his position as President of CENI in the future, and the fact that the 2018 elections ultimately

took place and led to a peaceful transfer of power, thus, according to Nangaa, fulfilling his mandate as CENI President.  A.R. 237–38.

OFAC acknowledged receipt of Nangaa's petition, A.R. 1147–1148, and sent Nangaa follow-up questions, *see* A.R. 1165–68, to which he responded, A.R. 1169–1175.

### c.  OFAC's Denial of Nangaa's Petition For Reconsideration

On August 31, 2021, OFAC denied Nangaa's petition for reconsideration.  A.R. 1 (OFAC Denial Letter), 8–18 (Unclassified OFAC Petition Denial Evidentiary).  The agency expressly acknowledged each of the arguments Nangaa raised in his petition, and explained that it had conducted a thorough review of the evidence in the record, "including material [Nangaa] submitted."  A.R. 1.  Notwithstanding Nangaa's submissions, OFAC determined that he "ha[d] not provided credible arguments or evidence establishing that an insufficient basis exists for [his] designation," or "that the circumstances resulting in the designation no longer apply."  A.R. 1–2.

Specifically, OFAC determined that Nangaa did in fact misappropriate state assets belonging to CENI and oversaw officials who inflated the costs of CENI contracts, leading CENI to postpone the 2016 election due to a lack of funding and delays in voter registration.  A.R. 2, 9–10.  OFAC determined that Nangaa did in fact enrich himself through the purchase and sale of gasoline, thus delaying voter registration in the Kasai province, and that he did in fact authorize CENI personnel to make personal use of CENI funds and then fabricate expense reports.  A.R. 2, 10, 13.  And OFAC determined that Nangaa did in fact bribe Constitutional Court Justices, leading to a breach in the court's quorum provisions and approval of CENI's case to delay the 2016 election.  A.R. 2, 14–15.  In light of these findings, OFAC concluded that Nangaa "ha[d] not been fully transparent in his delisting petition and questionnaire responses to a point where OFAC can reasonably believe [his] various representations."  A.R. 8.  OFAC also considered evidence post-

dating Nangaa's designation indicating that he continued to serve as CENI President and had overstayed his mandate by two years.  A.R. 16, 1514–15.  The agency assessed that Nangaa had "maintained an effort to exert influence over democratic processes or institutions in the DRC, including those related to CENI."  A.R. 16.

OFAC's decision to deny Nangaa's petition also relied in part on foreign policy guidance provided by the U.S. Department of State.  *See* A.R. 1162–64.  The State Department agreed that Nangaa "played a significant role in undermining" the DRC's "democratic processes and institutions" as President of CENI.  A.R. 17, 1162.  The State Department explained that Nangaa's embezzlement and misappropriation of CENI funds "directly advanced and supported corrupt and anti-democratic efforts to protect the power of former DRC President Joseph Kabila."  A.R. 1162.  And the State Department noted that although Kabila lost the 2018 election, the actions of Nangaa and his associates caused "debilitating damage" to CENI's "credibility and legitimacy with the Congolese people," undermining confidence in upcoming elections in 2023.  *Id.*

The State Department assessed that delisting Nangaa at that time—when critical elections were on the horizon, reform of CENI was incomplete, and Nangaa had not demonstrated a significant change in behavior—would significantly undermine democratization and reform efforts in the DRC, as well as U.S. foreign policy goals.  A.R. 17, 1163.  The State Department also noted that politicians in the DRC had "told U.S. officials they are looking for reasons to slow the electoral process and delay the 2023 elections," and that delisting Nangaa would "directly contravene [U.S.] efforts to push back on future delays, which could further undermine the democratic process."  A.R. 17, 1163.  Finally, the State Department explained that delisting Nangaa would remove a deterrent for current DRC officials to work with Nangaa and could allow

him to increase his influence over CENI or other parts of the DRC government heading into the 2023 elections—even if Nangaa were replaced as head of CENI.  AR. 17–18, 1163.

In light of all the evidence before the agency, OFAC determined that Nangaa continues to be properly designated pursuant to the original designation criteria despite his assertions that he fulfilled his CENI mandate and plans to resign from CENI.  A.R. 2, 16.

### d.  Procedural History

On November 10, 2021, Nangaa filed this action against OFAC and its Acting Director, challenging the denial of his petition for reconsideration.  Compl., ECF No. 1.  After OFAC produced to Nangaa a redacted, unclassified version of the administrative record supporting his petition denial, *see* Notice, ECF No. 5, Nangaa amended his complaint, *see* Am. Compl., ECF No. 6.

The Amended Complaint advances multiple claims concerning OFAC's denial of Nangaa's petition.  Specifically, Nangaa asserts that OFAC failed to provide adequate notice of the reasons for its denial in violation of the Fifth Amendment, *id.* ¶¶ 90–92; that OFAC failed to provide adequate notice in violation of the APA, *id.* ¶ 93–95; and that OFAC's denial was arbitrary and capricious under the APA, *id.* ¶ 83–89.  Nangaa seeks a variety of relief, including an order vacating the denial of his delisting petition; an order rescinding his designation; an order compelling OFAC to produce unclassified summaries of classified or otherwise privileged evidence; and an order compelling OFAC to produce "alternative means by which Nangaa may be given sufficient notice of the reasons for the denial of his delisting petition."  *Id.*, Relief Requested.

He also requests that the Court conduct an *ex parte*, *in camera* review of the bases for OFAC's classification of portions of the administrative record. *Id.*

## LEGAL STANDARDS

On a motion to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). "Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts do not have subject matter jurisdiction to decide the case." *Prisology v. Fed. Bureau of Prisons*, 74 F. Supp. 3d 88, 93 (D.D.C. 2014), (citing *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012)), *aff'd sub nom.*, 852 F.3d 1114 (D.C. Cir. 2017).

A Rule 12(b)(6) motion tests whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). For purposes of a Rule 12(b)(6) motion, the "complaint" also includes matters incorporated therein. *E.g.*, *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009).

Rule 12(d) authorizes the court to treat a Rule 12(b)(6) motion as a motion for summary judgment under Rule 56 where the defendants rely on matters outside the pleadings, provided that all parties have a reasonable opportunity to present all material pertinent to the motion. Fed. R. Civ. P. 12(d); *Conant v. Wells Fargo Bank, N.A.*, 60 F. Supp. 3d 99, 106-07 (D.D.C. 2014). Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Conant*, 60 F. Supp. 3d at 107.  In the context of an APA claim, "[s]ummary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Zevallos v. Obama ("Zevallos I")*, 10 F. Supp. 3d 111, 117 (D.D.C. 2014), *aff'd*, *Zevallos v. Obama ("Zevallos II")*, 793 F.3d 106 (D.C. Cir. 2015) (citation omitted); *see also id.* (noting the court's "limited role . . . in reviewing the administrative record" and explaining that "[w]hen assessing a summary judgment motion in an APA case, the district judge sits as an appellate tribunal") (citations omitted).

## ARGUMENT

### I.     OFAC's Denial of Nangaa's Petition For Reconsideration Accords With the Fifth Amendment.

In Count II of his Amended Complaint, Nangaa alleges that OFAC infringed upon his Fifth Amendment right to due process by failing to adequately notify him of the basis for its decision to deny his delisting petition.  Am. Compl. ¶¶ 90–92.  However, as a foreign person lacking substantial contacts with the United States, Nangaa cannot assert any constitutional rights.  In any event, the process provided by OFAC accords with any process that Nangaa may be due, and his claim thus fails.

#### a.  Nangaa Cannot Assert Constitutional Rights.

"[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *accord Johnson v. Eisentrager*, 339 U.S. 763, 770-71 (1950).  Some constitutional protections may apply when aliens "have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)

(plurality opinion).  Although the D.C. Circuit has not directly addressed substantial connection claims within the context of an OFAC sanctions case, the Circuit's discussion of the issue in Foreign Terrorist Organization ("FTO") cases is instructive.  *Cf. Kadi v. Geithner*, 42 F. Supp. 3d 1, 25–26 (D.D.C. 2012) (comparing FTO cases).  In *National Council of Resistance of Iran v. Department of State*, the D.C. Circuit concluded that two Iranian organizations could bring a due process challenge because they had an "overt presence within the National Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank account."  251 F.3d 192, 201 (D.C. Cir. 2001).  By contrast, in *32 County Sovereignty Committee v. Department of State*, the D.C. Circuit rejected the petitioners' claim to constitutional rights where they "demonstrated neither a property interest nor a presence in this country."  292 F.3d 797, 799 (D.C. Cir. 2002) (holding that rental of post-office boxes in United States and use of bank account to transmit funds—without evidence of any controlling interest in property—did not qualify); *see also People's Mojahedin Org. of Iran v. Dep't of State,* 182 F.3d 17, 22 (D.C. Cir. 1999) ("A foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise.").

Here, the Amended Complaint demonstrates that Nangaa may not bring a claim based on constitutional rights.  He acknowledges that he is a foreign national who does not reside in the United States.  Am. Compl. ¶ 12.  Yet he does not plead facts that would demonstrate a substantial connection—let alone any connection—to this country.  *See generally id.*  Although Nangaa states that "his property and interests in property within U.S. jurisdiction are blocked," *id.* ¶ 18; *see also id.* ¶ 80, this assertion is merely a description of the legal consequence of his designation, rather than evidence of any purported substantial connection to the United States.  *See* 50 U.S.C. § 1702(a)(1)(B); E.O. 13,413 as amended, § 1(a)(ii)(C)(2); *see also Rakhimov*, 2020 WL 1911561,

at *5 ("Describing the legal consequences of any person's addition to the SDN list, however, does not establish Plaintiff's substantial connections to the United States. Were it otherwise, anyone challenging an OFAC designation would enjoy constitutional protections, regardless of the extent of her ties to this country.").

Indeed, evidence in the record confirms that Nangaa lacks any such substantial connection. During the administrative reconsideration process, Nangaa confirmed to OFAC in writing that his residential address as well as his previous or alternate address are both in the DRC. A.R. 1170. He stated that he "does not retain any interest in any financial accounts in the United States," and that, while his wife maintains a bank account in the United States, he "does not maintain an interest in that account." A.R. 1170–71. And he acknowledged that he owns no interest in real property in the United States, nor owns or controls any companies in the United States or elsewhere. A.R. 1170–72. Given this record evidence, there is no serious dispute that Nangaa lacks sufficient connections to this country and may not avail himself of the Fifth Amendment. *See Rakhimov*, 2020 WL 1911561, at *5 (dismissing due process claim because sanctioned plaintiff's "own pleadings and submissions fail to allege the existence of even a single piece of his property in the United States, or his presence here at any moment in time," which was insufficient "[under] any conceivable standard" for assessing whether a person has substantial connections); *Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 21 (D.D.C. 2020) (dismissing due process claim where sanctioned plaintiff had "not established *any* connection to the United States, let alone a substantial one").

Because Nangaa has not alleged facts sufficient to demonstrate standing to assert Fifth Amendment rights, the Court should dismiss Count II for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1). Alternatively, to the extent the Court considers the record evidence of

17

Nangaa's lack of connections to the United States, the Court should grant summary judgment to Defendants on Count II pursuant to Rule 56.[3]

### b. Nangaa's Fifth Amendment Due Process Arguments Fail On The Merits.

Even if Nangaa could assert a Fifth Amendment claim—and he cannot—the Court should nonetheless hold that OFAC's well-established administrative procedures satisfy due process. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citations omitted). "The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (citation omitted). In the context of OFAC's designation of an SDN—where pre-deprivation notice is not required, *see Zevallos II*, 793 F.3d at 116; *Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 163-64 (D.C. Cir. 2003)—due process mandates only that OFAC provide Nangaa with "a basis from which to understand his designation, and thereby offer rebuttal arguments and evidence in response." *Zevallos I*, 10 F. Supp. 3d at 131. In practice, this means Nangaa is entitled to notice of his designation, to "the unclassified administrative record on which [OFAC] relied in

---

[3] Some courts in this district have held that "the question of whether a foreign plaintiff may bring a Fifth Amendment due process claim is not a jurisdictional question; if it were, the Circuit's approach in *Jifry* would be inconsistent with the Supreme Court's admonition that a court may not assume jurisdiction for purposes of resolving the merits of a claim." *Joumaa v. Mnuchin*, No. 17-2780 (TJK), 2019 WL 1559453, at *10 n.13 (D.D.C. Apr. 10, 2019), *aff'd, Joumaa v. Mnuchin ("Joumaa II")*, 798 F. App'x 667, 669 (D.C. Cir. 2020) (per curiam); *see also Olenga v. Gacki*, 507 F. Supp. 3d 260, 273 (D.D.C. 2020). Defendants respectfully disagree, as the D.C. Circuit in *Jifry* did not address the Supreme Court's admonition against assuming jurisdiction. *Jifry*, 370 F.3d at 1183. As Article III standing is a threshold jurisdictional issue, the Court here should resolve Nangaa's constitutional claim on that basis, without assumptively reaching the merits. *See Fulmen Co. v. OFAC*, 547 F. Supp. 3d 13, 22 (D.D.C. 2020) ("I am skeptical that our Circuit Court intended to *require* us to skip the standing inquiry in all cases. And, in cases like this one, where plaintiffs' allegations *foreclose* their ability to assert constitutional claims, it seems especially inappropriate to consider the merits.").

taking its blocking action," and to "an opportunity to present evidence in written form to rebut the basis for the designation." *Id.* at 129.

### i. OFAC Afforded Nangaa Constitutionally Sufficient Process.

Here, at each stage of the administrative process, Nangaa received the process he was due. First, contrary to Nangaa's allegation that OFAC "refus[ed] to disclose the basis for the original designation," Am. Compl. ¶ 6, OFAC provided Nangaa with the unclassified administrative record supporting his original designation. *See* A.R. 971–1146. That record clearly identified the factual basis for the agency action, including the specific embezzlement, misappropriation, and bribery schemes Nangaa had undertaken or overseen as CENI President. *See* A.R. 26 (press release describing Nangaa's conduct as CENI President). OFAC also provided Nangaa an opportunity to challenge those findings in the form of a petition for reconsideration, which he pursued. A.R. 210–239. Upon Nangaa's submission of that petition, OFAC sent him follow up questions, granting him another opportunity to present arguments and evidence, A.R. 1165–1168, which again he took, A.R. 1169–1346. As Nangaa concedes, OFAC's procedures permitted him to submit "thousands of pages of exhibits" challenging his designation. Am. Compl. ¶ 2. After denying Nangaa's petition for reconsideration, OFAC again provided him notice of its decision, A.R. 1–4, as well as the administrative record supporting that petition denial, *see* ECF No. 5. And should Nangaa desire to pursue reconsideration again, he may do so. *See* 31 C.F.R. § 501.807. As the D.C. Circuit has recognized, these procedures satisfy due process. *See Zevallos II*, 793 F.3d at 116–17 (no due process violation where petitioner received "the unclassified evidence on which [OFAC] relied to

designate him," was provided a "chance to contest the propriety and adequacy of that evidence," and "remains free now to continue contesting his designation by filing new delisting requests").

### ii.  OFAC Appropriately Relied On Classified Information.

Notwithstanding OFAC's comprehensive process, Nangaa argues the agency violated the Fifth Amendment because of the extent to which it redacted classified materials.  Am. Compl. ¶ 92.  He is mistaken.  IEEPA expressly authorizes OFAC to rely upon classified information in an administrative record to support a designation.  *See* 50 U.S.C. § 1702(c) ("[I]f the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera").  As a result, courts regularly uphold sanctions designations where they rely on undisclosed classified material.  *See, e.g.*, *Fares v. Smith*, 901 F.3d 315, 324–25 (D.C. Cir. 2018) (rejecting argument that OFAC cannot rely on undisclosed classified and law enforcement privileged information to support a designation) (citation omitted); *Kadi*, 42 F. Supp. 3d at 24 (finding that "it was wholly proper for OFAC to rely on classified material in making its determination").

Indeed, the D.C. Circuit has repeatedly held that "due process require[s] the disclosure of *only* the unclassified portions of the administrative record."  *Holy Land Found.*, 333 F.3d at 164 (citation omitted); *see also Nat'l Council of Resistance of Iran*, 251 F.3d at 208–09 (holding that, under due process clause, agency "need not disclose the classified information to be presented *in camera* and *ex parte* to the court"); *Jifry*, 370 F.3d at 1183-84 (holding that government satisfied notice requirements of due process by informing pilots, all foreign nationals, that their airmen

20

certificates had been revoked based on TSA's determination that they were a "security threat" without requiring agency to disclose the reasons for the determination, which were classified).

To the extent Nangaa seeks unclassified summaries of the classified basis for OFAC's denial of his petition, his argument fares no better. *See* Am. Compl., Prayer for Relief. "While courts have recognized that unclassified summaries of classified information on which an agency relied may be helpful to litigants, they are not required and 'disclosure may not always be possible.'" *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 119 n.2 (D.D.C. 2015) (quoting *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 983 (9th Cir. 2012)); *see also Rakhimov*, 2020 WL 1911561, at *7 (declining to "impose the unprecedented remedy of mandating the issuance of an unclassified summary or allowing his counsel access to classified material").

Here, unclassified summaries of classified evidence are particularly unwarranted because a similar summary already exists, unredacted, in the record. That is, OFAC's press release announcing Nangaa's designation, which is part of the administrative record, summarizes OFAC's factual findings regarding Nangaa's conduct, including findings based on classified or otherwise protected reporting. A.R. 25–31. In addition, OFAC's denial letter explains the reasons for the agency's rejection of Nangaa's petition for reconsideration. These materials thus obviate any purported need for additional summaries of classified information or "alternative means by which to understand the bases for the denial." Am. Compl. ¶ 92; *see Bazzi v. Gacki*, 468 F. Supp. 3d 70, 79 (D.D.C. 2020) (noting that OFAC's press release "provided a sufficiently detailed summary to adequately explain OFAC's reasons for designating" plaintiff) (citation omitted); *Deripaska v. Yellen*, No. 21-5157, 2022 WL 986220, at *2 (D.C. Cir. Mar. 29, 2022) (noting that OFAC press

release "summariz[es] the extensive justifications OFAC gave in its evidentiary memoranda," which included classified material).

Finally, Nangaa's request for the Court to conduct an *ex parte*, *in camera* review of the "bases" for the government's classifications should be denied.  Am. Compl., Prayer for Relief. While it is entirely appropriate for the Court to review the classified evidence in evaluating the propriety of OFAC's action, *see* 50 U.S.C. § 1702(c), Nangaa has identified no reason why the Court need review the "basis" of the government's classifications.  After all, numerous courts have adjudicated OFAC sanctions cases involving classified evidence without conducting such a review.  *See, e.g.*, *Rakhimov*, 2020 WL 1911561, at *7.

### iii.   Nangaa Was Not Entitled To Disclosure Of The State Department's Foreign Policy Guidance Before OFAC Denied His Petition.

Nangaa is on no firmer ground in arguing that OFAC was required to disclose the State Department's foreign policy guidance prior to reaching a decision on his petition for reconsideration.  Am. Compl. ¶ 68–69.  To be clear, OFAC considered the State Department's guidance only in deciding Nangaa's petition for reconsideration—*not* for his initial designation. Thus, when OFAC produced the administrative record supporting his initial designation, *see* A.R.971–1146, it appropriately did not include any State Department guidance.  And once OFAC did consider that guidance—in its decision denying Nangaa's petition—OFAC then disclosed the guidance.  *See* A.R. 1162–1164.  Nangaa cites no authority for his apparent view that, in denying a petition for reconsideration, OFAC cannot rely on *new* exhibits without first disclosing them to the petitioner.  Indeed, courts routinely uphold denials of petitions for reconsideration where they rely on new evidence that was not part of the original administrative record.  *See, e.g.*, *Zevallos II*, 793 F.3d at 116–17.  Here, Nangaa was aware of the unclassified basis for his designation, had an

opportunity to challenge that designation, and is free now to challenge it again if he chooses.  That is all due process requires.[4]  *See id*.

### iv.  Nangaa's Complaints About Specific Redactions Are Not Before The Court, And Lack Merit In Any Event.

Finally, the Amended Complaint points to a handful of redactions in the record that Nangaa believes are improper.  Am. Compl. ¶ 73–78.  To the extent he contends that, due to these particular redactions, OFAC has failed to provide him constitutionally sufficient notice, that argument is meritless.  First, the propriety of these redactions is not properly before the Court in this dispositive motion, as Nangaa has not moved to supplement the record or lift the redactions.  Second, even if these redactions were before the Court, they can hardly support a claim that Nangaa did not receive constitutionally sufficient notice, given all the other information disclosed in OFAC's denial letter, press release, and full unclassified administrative record.  Third, the redactions themselves either already have been lifted or are wholly justified.  That is, pursuant to a meet and confer process, OFAC has already lifted redactions over language citing to Nangaa's petition for reconsideration, *see* A.R. 9, 12; Am Compl. ¶ 76, as well as the second full paragraph on AR 16 and the relevant, non-privileged portions of Exhibit 22, *see* A.R. 16, 1508–16; Am Compl. ¶ 77.  As to the remaining redactions Nangaa flags, footnotes 2 and 4 are properly redacted because, although the footnotes themselves are unclassified, they reveal the subject matter of classified discussions in the body of the evidentiary.  A.R. 6; Am Compl. ¶ 74–75.  And Exhibit 8 and references to it are properly redacted because that exhibit is classified.  *See* A.R. 19 (marking Exhibit 8 as classified at the

---

[4] In any case, any error in precisely *when* OFAC disclosed the State Department's guidance would be harmless, as Nangaa now has that guidance and is free to submit another petition for reconsideration.  *See Ajaka v. Gacki*, No. 1:19-CV-01542 (CJN), 2021 WL 3633609, at *5 (D.D.C. Aug. 17, 2021) (applying harmless error doctrine to OFAC delay in producing materials).

"Confidential" level); Am Compl. ¶ 78.  For these reasons, Nangaa's allegations about scattered redactions in the record do not establish a violation of due process.

*       *       *

Because OFAC provided Nangaa all the process he was due, his claimed Fifth Amendment violation fails.  Thus, even if the Court were to reach the merits of this issue, it should grant summary judgment in favor of Defendants pursuant to Rule 56.

## II.    OFAC Provided Nangaa With Sufficient Notice Under the APA.

In Count III of his Amended Complaint, Nangaa recasts his notice-based argument as an APA claim.  Am. Compl. ¶¶ 93–95.  While the APA requires OFAC to provide Nangaa with the administrative record underlying his designation once a lawsuit is initiated, *cf. Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record."), it does not entitle him to the classified or otherwise protected portions of that record, *see, e.g.*, *Sulemane v. Mnuchin*, No. 16-1822 (TJK), 2019 WL 77428 at *7 (D.D.C. Jan. 2, 2019) (explaining that the APA's "notice provision merely requires OFAC to tell [the plaintiff] its grounds for the denial of his request for reconsideration [and] . . . . does not require OFAC to provide [the plaintiff] the classified or law enforcement-privileged information supporting those grounds").  OFAC already provided Nangaa the unclassified administrative record, including materials supporting both his initial designation and the denial of his petition for reconsideration.  Nangaa cites to 5 U.S.C. § 555(e), which requires only that, when an agency denies "a written application, petition, or other request of an interested person made in connection with any agency proceeding," the agency must provide "a brief statement of the grounds for denial."  Am. Compl. ¶¶ 93–95.  Here, OFAC's denial letter, A.R. 1–2, along with the full

24

unclassified administrative record, ECF No. 5, easily satisfy this provision.  Nangaa fails to identify an entitlement to anything further under the APA, and his claim thus fails.

The Court should therefore dismiss Count III of the Amended Complaint pursuant to Rule 12(b)(6) or, in the alternative, grant summary judgment to Defendants under Rule 56.

## III.   OFAC Did Not Violate The APA By Denying Nangaa's Petition For Reconsideration.

In his Amended Complaint, Nangaa claims that the denial of his petition for reconsideration violates the APA, arguing that he never met the blocking criteria set forth in 13,413, as amended, and, in any event, he has demonstrated a change in circumstances.  Am. Compl. ¶¶ 83–89 (citing 5 U.S.C. § 706(2)(A)).  At bottom, Nangaa alleges that OFAC did not consider the arguments he put forth in his petition, improperly credited the original grounds for his designation, and erroneously relied on foreign policy guidance from the Department of State.  *Id.* ¶¶ 86–88.  But as explained below, OFAC's decision withstands scrutiny under the applicable standard of review.

### a.   OFAC's Determination Is Entitled To Substantial Deference.

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).  As relevant here, a court should uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park*, 401 U.S. at 416.  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency," and the agency's decision should be affirmed so long as it is supported by a rational basis. *Id.*; *see also Zevallos I*, 10 F. Supp. 3d at 118–19.

This deference is further heightened in cases, like this one, that involve national security or foreign affairs. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."). The Supreme Court has emphasized the need for courts to grant this heightened deference, even when considering constitutional claims. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010). And the courts have routinely applied such heightened deference in economic sanctions cases, such as the instant case. *See Olenga v. Gacki*, 507 F. Supp. 3d 260, 280 (D.D.C. 2020) ("The D.C. Circuit has shown extreme deference to blocking orders, which fall at the intersection of national security, foreign policy, and administrative law.") (citation omitted); *Zevallos I*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of deference to the political branches in matters of foreign policy, including cases involving blocking orders." (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular

deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *Pejcic v. Gacki*, Civil Action No. 19-2437 (APM), 2021 WL 1209299, at *6 (D.D.C. Mar. 30, 2021) ("The court's review is particularly deferential in this case because the issues at hand implicate national security, foreign policy, and administrative law."); *Rakhimov*, 2020 WL 1911561, at *6 ("The D.C. Circuit . . . has urged courts to be particularly deferential to executive blocking orders, decisions at the intersection of national security, foreign policy, and administrative law.").

**b.   OFAC's Reasoned Decision Satisfies This Deferential Standard.**

After reviewing all of the available evidence and assessing the merits of Nangaa's arguments, OFAC reasonably concluded that it properly designated Nangaa and that Nangaa had not demonstrated changed circumstances that would warrant his removal from the SDN List.  A.R. 1–2, 8–18.

**i.   OFAC Reasonably Concluded That The Original Basis For Nangaa's Designation Still Applies.**

In response to Nangaa's petition for reconsideration, OFAC considered the evidence before it and determined that Nangaa did in fact misappropriate CENI assets and oversee CENI officials who inflated voting machines contracts, causing the 2016 presidential election to be postponed due to lack of funds and delays in voter registration.  A.R. 2, 8-13.  OFAC similarly determined that Nangaa did in fact embezzle funds from the purchase and sale of gasoline, leading to registration delays in the province of Kasai, A.R. 2, 10–11, and did in fact authorize CENI officials to make personal use of CENI funds and fabricate expense reports, A.R. 2, 13–14.  And OFAC determined that Nangaa did in fact bribe Constitutional Court justices, causing a breach in the court's quorum rules and facilitating the approval of CENI's request to delay the 2016 elections. A.R. 2, 13-14.  These findings clearly support OFAC's conclusion that it properly designated Nangaa for being "responsible for or complicit in, or [for having] engaged in, directly or indirectly

. . . actions or policies that undermine democratic processes or institutions" in the DRC.  E.O.

13,413, as amended, § 1(a)(ii)(C)(2).

Nangaa denies these findings, and speculates that OFAC did not meaningfully consider the

arguments and documentation he submitted in support of his petition for reconsideration.  *See,*

*e.g.*, Am. Compl. ¶ 8 (asserting OFAC "failed to fairly consider Nangaa's delisting petition and

the arguments and evidence contained therein").  A cursory review of the administrative record

establishes just the opposite—that OFAC considered each of Nangaa's arguments.  *See* A.R. 1

(citing Nangaa's arguments and stating that OFAC reviewed "the evidence in the record regarding

[his] designation as an SDN, including material [he] submitted"), 5–18 (expressly acknowledging

the arguments raised in Nangaa's petition).  Nangaa's real grievance appears to be that OFAC did

not agree with his arguments or find his denials to be credible.  But an obligation to review

evidence is not an obligation to agree.  And here, where "the record makes clear that [OFAC]

considered the competing facts," the Court "must defer to OFAC's resolution of which pieces of

evidence were most credible and convincing."  *Olenga*, 507 F. Supp. at 282; *see also Zevallos II*,

793 F.3d at 114 ("[W]hen we evaluate agency action, we do not ask whether record evidence could

support the petitioner's view of the issue, but whether it supports the [agency's] ultimate

decision.") (citation omitted).

Moreover, Nangaa acknowledges that he is not privy to the classified version of the

administrative record, which expands upon OFAC's rationale for denying his petition for

reconsideration.  *See, e.g.*, Am. Compl. ¶ 31.  Upon the completion of briefing, the government

will lodge the classified version of the administrative record with the Court Information Security

Office, enabling the Court to request the classified record at its convenience.  *See* 50 U.S.C.

§ 1702(c).  A review of the classified record will demonstrate that OFAC reasonably concluded

that Nangaa met the criteria for designation, as well as that he "has not been fully transparent" in his submissions "to a point where OFAC can reasonably believe [his] various representations." A.R. 8.

Nangaa also argues that, even if he did misappropriate CENI assets, the election was not delayed by his corrupt conduct, but rather by a need to update CENI's voter registry. A.R. 230–31; Am. Compl. ¶¶ 36–39. Thus, he contends, his misappropriation of assets did not undermine the DRC's democratic processes or institutions, and he did not meet the criteria for designation under E.O. 13,413, as amended. A.R. 230–31; Am. Compl. ¶¶ 36–39. This argument is wrong on both the facts and the law. On the facts, OFAC cited a news article explaining that CENI itself stated the presidential elections would be delayed due, at least in part, to a lack of funding—thus tying Nangaa's misuse of funds directly to election delays. A.R. 9. More fundamentally, the evidence before OFAC showed that Nangaa's corrupt actions led to delays in registering voters, therefore contributing to the out-of-date voter registry. *See* A.R. 10–11 (evidence that Nangaa's corrupt purchase and sale of gasoline for profit delayed voter registration in Kasai province). In light of the facts in the record, OFAC assessed that Nangaa's argument about the reasons for elections delays "lacks credibility." A.R. 9. That judgment is "a relevant ground for denial" and is entitled to deference. *Joumaa II*, 798 F. App'x at 668.

On the law, delaying an election is not the only way to "undermine democratic processes or institutions" in the DRC. E.O. 13,413, as amended, § 1(a)(ii)(C)(2); *see, e.g.*, *Olenga*, 507 F. Supp. 3d at 280 (disruption of protests and support for violence against protesters and Western diplomats "undermine[d] democratic processes or institutions" in the DRC). Here, in addition to delaying elections, Nangaa's misappropriation of assets undermined confidence in CENI and in elections generally. As the State Department explained, Nangaa and his associates caused

"debilitating damage" to CENI's "credibility and legitimacy with the Congolese people," leading

to low voter confidence ahead of elections in 2023.  A.R. 1162; *see also* A.R. 17.   Therefore, even

if Nangaa's misappropriation of assets did not delay the 2016 election (contrary to news reports

and OFAC's considered judgment), his conduct still "undermine[d] democratic processes or

institutions"—including both CENI and the upcoming election in 2023.  E.O. 13,413, as amended,

§ 1(a)(ii)(C)(2).

Nangaa further contends that he had no reason to bribe Constitutional Court justices

because their ruling postponing the election was, in his view, consistent with DRC law.  Am.

Compl. ¶ 58; AR 235–36.  But according to the Official Gazette of the DRC, three justices of the

Constitutional Court were not sitting when the court granted CENI's petition to uphold the election

delay, notwithstanding "that the Court may only validly sit and deliberate in the presence of all its

members," thus appearing to breach the court's own quorum provisions.[5]  A.R. 15.  In light of this

and other evidence available to OFAC, including classified evidence, the agency found Nangaa's

denial of bribing Constitutional Court justices to be unpersuasive, *see* A.R. 1–2, 14.

Likewise, Nangaa argued that he could not have enriched himself from sales of gasoline

because the Minister of Economy sets the prices for gas in the DRC, and that he could not have

delayed voter registration in Kasai province because registration there was delayed instead by a

local insurrection.  Am. Compl. ¶ 40; A.R. 232–233.  OFAC expressly considered each of these

arguments, *see* A.R. 10, but ultimately declined to credit them in light of the strength of the other

evidence before the agency, including again classified evidence.  A.R. 1–2.  OFAC is entitled to

---

[5] The President of the Constitutional Court attempted to justify its disregard of the
quorum requirement by citing the principle "salus populi suprema lex esto," or "law of
necessity."  A.R. 15.

weigh competing evidence, and its decisions to credit certain arguments and evidence over others is entitled to deference.  *Olenga*, 507 F. Supp. 3d at 282; *Zevallos II*, 793 F.3d at 114.

### ii. OFAC Reasonably Concluded That Nangaa Had Not Demonstrated A Sufficient Change In Circumstances.

OFAC also considered, and reasonably rejected, Nangaa's contention that there had been "a change in circumstances negating the basis for [his] designation."  Am. Compl. ¶ 24; A.R. 2, 16–18.  Nangaa argued that both his intent to resign as President of CENI and the fact that the 2018 elections transpired at all negated the basis for his designation.  Am. Compl. ¶ 24.  However, no evidence in the record—including in Nangaa's delisting petition—suggested Nangaa had actually resigned as CENI President.  To the contrary, evidence post-dating Nangaa's designation indicated that he remained as CENI President and had overstayed his mandate by two years.  A.R. 16, 1514–15.  Moreover, as the State Department explained, Nangaa's political coalition in the DRC was actively delaying efforts to appoint his replacement.  A.R. 1163.  OFAC thus assessed that Nangaa had "maintained an effort to exert influence over democratic processes or institutions in the DRC, including those related to CENI."  A.R. 16; *see also* A.R. 8 (Nangaa "has not sufficiently removed himself from the circumstances that led to his designation").   OFAC also endorsed the State Department's reasoning that delisting Nangaa "could allow him to increase his influence over CENI or other parts of the DRC government heading into 2023—even if he is replaced as the head of CENI."  A.R. 17–18; *see also* A.R. 1163.  And despite the fact that the 2018 elections eventually took place after multiple years of delay, the State Department assessed that Nangaa had not demonstrated any concrete changes in behavior so as to alleviate concerns he would interfere again with upcoming elections in 2023.  A.R. 17, 1163.

The State Department thus concluded—and OFAC agreed—that delisting Nangaa could "directly contravene" the United States' efforts to push back on future election delays, which could

further undermine democratic processes in the DRC.  A.R. 17, 1163.  Accordingly, absent a showing that Nangaa had taken any remedial steps, OFAC rejected Nangaa's argument that the eventual occurrence of the 2018 elections and a mere promise to resign established a change in circumstances sufficient to negate the basis for his designation.  A.R. 1–2, 18.

Nangaa appears to contend, erroneously, that OFAC cannot rely on the Department of State's foreign policy guidance.  *See* Am. Compl. ¶ 72.  Nangaa has not and cannot cite to any authority for this premise.  Executive Order 13,413, as amended, specifically instructs the Secretary of the Treasury to act "in consultation with the Secretary of State."  E.O. 13,413, as amended, §§ 1(a)(ii), (4).  And as courts in this district have recognized, it is "reasonable for OFAC to accept the findings of the State Department," *Pejcic*, 2021 WL 1209299, at *8, which are "legitimate reasons" for OFAC to reach particular decisions, *Zarmach Oil Servs., Inc.*, 750 F. Supp. 2d at 159.  Indeed, the State Department's foreign policy guidance is "owed substantial deference" when relied on by OFAC.  *Zarmach Oil Servs., Inc.*, 750 F. Supp. 2d at 158-59; *see also Pejcic*, 2021 WL 1209299, at *8 (holding that "[i]t was reasonable for OFAC to accept the findings of the State Department" and "that is sufficient for th[e] court to affirm OFAC's determination").  Here, as one of many pieces of evidence, OFAC reasonably relied on the State Department's guidance in concluding that granting Nangaa's petition for reconsideration would hinder both U.S. foreign policy and democratic processes and institutions in the DRC.  That determination is entitled to deference.

As set forth above, the administrative record amply demonstrates that OFAC's denial of Nangaa's petition for reconsideration satisfies the highly deferential standard of review applicable here.  *See Islamic Am. Relief Agency*, 477 F.3d at 734; *Rakhimov*, 2020 WL 1911561, at *6.

Accordingly, pursuant to Rule 56, the Court should grant Defendants' summary judgment on Count I of the Amended Complaint.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Amended Complaint, or, in the alternative, grant summary judgment for Defendants.


Dated: April 20, 2022                          Respectfully submitted,

                                               BRIAN M. BOYNTON
                                               Principal Deputy Assistant Attorney General

                                               DIANE KELLEHER
                                               Assistant Branch Director

                                               /s/ *Matthew Skurnik*
                                               MATTHEW SKURNIK, NY Bar No. 5553896
                                               Trial Attorney
                                               United States Department of Justice
                                               Civil Division, Federal Programs Branch
                                               1100 L Street, NW
                                               Washington, D.C. 20005
                                               (202) 616-8188
                                               Matthew.skurnik@usdoj.gov

                                               *Counsel for Defendants*